**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CARL FANARO,**

       **Petitioner,**                 **CASE NO. 2:10-CV-1002**
                                   **JUDGE FROST**
       **v.**                       **MAGISTRATE JUDGE KING**

**FRANCISCO PINEDA, WARDEN,
HOCKING CORRECTIONAL FACILITY,**

       **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the *Petition*, Respondent's *Return of Writ* and Supplemental *Memorandums in Support*, Petitioner's *Traverse*, Respondent's *Reply,* Petitioner's *Response,* and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that an evidentiary hearing be held on Petitioner's claim that he was denied the effective assistance of counsel because his attorney failed to properly advise him of the advisability of proceeding to trial and of the potential sentencing ramifications he faced. The Magistrate Judge **FURTHER RECOMMENDS** that the remainder of Petitioner's claims of ineffective assistance of trial counsel be **DISMISSED** as without merit. Because habeas corpus claims four through six may be moot, depending on the outcome of these proceedings, the Court will address such claims at a later date.

## FACTS and PROCEDURAL HISTORY

The Ohio Fifth District Court of Appeals summarized the facts and procedural history of this case as follows:

In this case, during the course of the trial the jury heard the testimony

of the following victim-investors or relatives of deceased victims: Joyce Phipps, Sondra Soward, Alice Ceisil, Lola Phillips, Richard Price, Theresa Wygant, Ralph Redduck, Donald Betts, Richard Pickering, Connison Wilson, Lorraine Rataiczak, Richard Woodyard, Keith Emmons, Vicki West, Cletus Sorg, and Elmer Pletcher. Each of the victims had a similar profile and testified to a pattern of activity regarding the appellant's sale of securities and the resulting securities violations. Each of the victims were retired, between the ages of 60 and 90 years of age, high school graduates, with a moderate retirement income, modest savings and little or no investment or financial expertise.

Each victim was initially contacted by the appellant for the purposes of estate and financial planning. Some victims sought to exclude their assets from probate. Other victims sought to protect their assets for disabled or ailing relatives. Richard Pickering testified that he sought to establish safe investments to be placed in trust to assure financial security for his adult son with Downs Syndrome. T.II.742.

During the course of the ongoing "professional" relationship the appellant provided each victim with a business card and personal resume. The resume included false information regarding the appellant's training, education, ongoing certifications, and experience.FN5 Sandra Soward testified that the appellant represented himself as a paralegal and a financial planner. T.I.368. Keith Emmons testified that appellant helped him obtain a power of attorney for the purpose of investing his ninety-eight year old mother's money and that he personally invested money. Mr. Emmons testified that the appellant's resume was "impressive" and "very influencing". T.III. 924.

FN5. He admittedly, misrepresented that he held a bachelor of arts degree from the University of Maine in 1965, that he was a paralegal for the law firm of Hendrix and Associates, that he was a certified senior advisor, that he was a certified financial planner with experience at Merrill Lynch, and that he was a certified estate counselor. Transcript of Proceedings, Volume VI at pages 1721-1727.

The victims each testified that the appellant gained their trust. Theresa Wygant, an eighty-two year old widow, testified that she trusted the appellant completely and "I just needed someone to help me". T.II. 636 and 637.

2

The appellant advised the victims that he could provide them with immediate opportunities to invest in cable companies. The appellant further advised the victims that the investments were low risk with a guaranteed 10 percent, tax free monthly dividend, and the investors would have the ability to withdraw or transfer the invested funds. Joyce Phipps testified, "He advised me that I could get my money any time if I wanted ten cents or $10.00 or $100.00, I could withdraw my money at any time, and I couldn't-I couldn't." T.I. 303.

During the course of the transactions, the appellant asked the victims to sign either blank documents or to sign documents without any explanation of the terms. Richard Pickering testified that he signed the documents without reading them because "I trusted him." T.III.741.

The appellant failed to disclose that the investments were being made in a limited partnership. Investors were misled into believing that they were purchasing stock in cable companies. Ralph Redduck, 90 years of age, contacted the appellant to set up a living trust for his invalid adult son who was confined to a wheelchair. Mr. Redduck testified that the appellant never explained that the investment was in a limited partnership or the high level risk involved. T.II (Part 2). 659 and 665. The majority of the victims testified that they believed they were purchasing stock in cable companies. Connison Wilson testified, "I thought I was buying stock." T.VIII.766. Sandra Sowards testified, "we were under the impression we were actually buying stock into a cable company." T.I.384. Donald Betts testified, "He [appellant] said everybody bought cable or used cable so there wouldn't be no risk involved." T.II. 703.

Satisfied with the appellant's representations regarding the investment profiles, influenced by appellant's false credentials, and finding appellant trustworthy, the victims individually wrote checks or wired money to either Cable-Tex, Americable V, or Cable Unlimited, Inc. and invested sums in amounts ranging from approximately fourteen thousand to one hundred thousand dollars. Pursuant to the testimony presented, in total the victims invested more than five hundred thousand dollars between the years of 2002 and 2004.

The evidence established that prior to accepting the investments, the appellant failed to provide the victims with private placement memorandums. Private Placement Memorandums ("PPM") are generally provided to investors prior to accepting money. The PPM sets forth the investment profile for the cable companies. The PPM

manuals for the companies involved in these instances, explained that the investments were being made in a "speculative", long term (25 year), high risk limited partnership and that invested money could not be withdrawn or returned to the investor. In all cases, the victims received the PPM months after the investment had been made and their investment had been squandered. Vicky West testified that she invested twenty-thousand dollars in 2002, received the PPM in 2004, and was "devastated". She testified that she had invested all her savings and had no retirement pension. T.III. 957 and 959. Each victim testified that if the PPM had been available prior to the investment, they would not have taken a long term, high risk, especially at their ages and during their retirement years. Joyce Phipps testified that had she been provided with the information prior to making the investment, there was "no way" she would have invested. T.I. 303.

After the initial lump sum investment, each victim received, (what they believed to be), distribution checks. The amount of the distribution checks were nominal compared to their investments. Eventually they received a letter on cable company letterhead, signed by a general partner, stating that due to computer problems they would not be receiving monthly distributions. Eventually, they each learned, through correspondence, that the cable companies would no longer be making payments and that their investments were terminated without any reimbursement. Alice Ciesil testified that she never recovered her investments of forty thousand, twenty thousand and fifty-five thousand dollars. T.II.481. Lola Phillips testified that she received a letter that no further checks would be received. T.II.555.

Attorney Robert Hendrix, an attorney who accepted referrals from AARP and who worked with the appellant to meet clients and prepare estate planning documents, testified that he learned that the appellant was misrepresenting himself as a paralegal, advised appellant to stop, and terminated the relationship. T.III.989.

Richard Distelhorst, a CPA who prepares tax returns for cable companies testified that the victims, as limited partners, never received "dividends" or interest on their investments. He stated that the victims actually received partial returns of their own capital investments, i.e. they received their own money. That was the reason it was tax free. T. IV. 1217.

Sheldon Safko, an attorney employed by the Enforcement Section of

the Division of Securities testified that if a person is purchasing a limited partnership, they are purchasing a security according to Ohio law. He further testified that in order to sell a security, you must have a license from the Division of Securities. He testified that the appellant was never licensed in the State of Ohio. T.I.165-166. Furthermore, he testified that securities, such as limited partnerships, must be registered or fall under an exemption. In this case, the security sales were neither exempted nor registered. T.I.180-182.

*State v. Fanaro,* No. 2006CA00168, 2008 WL 555448, at *5-6 (Ohio App. 5th Dist. Feb. 21, 2008).

On January 27, 2006, the Licking County Grand Jury returned a one hundred and thirty four (134) felony count indictment against the appellant. The indictment included violations of R.C. 1707.44 for the sale of unregistered securities, the sale of securities without a license and false representation in the sale of securities. The indictment also included violations of R.C. 2913.51 for receiving stolen property and one count of engaging in a pattern of corrupt activity in violation of 2923.32(A)(1).

On February 24, 2006, the appellant entered a not guilty plea in abstentia to the charges in the indictment.

On October 16, 2006, the matter proceeded to trial. Prior to the presentation of evidence the state moved to dismiss eight (8) counts in the indictment.FN1 On October 27, 2006, the jury found appellant guilty of ninety-nine (99) counts in the indictment.FN2 The jury was unable to reach a unanimous verdict on the remaining counts for receiving stolen property. Appellant was found guilty of having committed thirty-two (32) fifth degree felonies, sixty six (66) third degree felonies and one (1) first degree felony. Sentencing was deferred pending a pre-sentence investigation.

FN1. The State dismissed counts, 92, 93, 94, 95, 113, 114, 115, and 116.

FN2. The convictions included as follows: twenty seven (27) counts of sales of unregistered securities, in violation of R.C. 1707.44(C)(1); twenty seven (27) counts of sales of securities without a license in violation of R.C. 1707.44(A)(1); twenty seven (27) counts of fraudulent practices in the sale of securities, in violation of R.C. 1707.44(G); seventeen (17) counts of false representation in the sale of securities, in violation of R.C. 1707.44(B)(4); one count of engaging in a pattern of corrupt activity, in violation of R.C.

2923.32(A)(1).

> On November 6, 2006, the State moved to voluntarily dismiss the remaining twenty seven (27) counts for receiving stolen property. On November 8, 2006, the State's motion to dismiss was granted.

> On December 18, 2006, appellant appeared for sentencing. The trial court sentenced appellant to serve six months on each of the thirty two (32) fifth degree felonies and further ordered these sentences to run consecutively to each other for a total of sixteen (16) years. The trial court also ordered appellant to serve one (1) year on three (3) of the third degree felonies (counts one, six and twenty-six) to run consecutively to each other for a total of three (3) years. The trial court further ordered appellant to serve a five (5) year sentence for the first degree felony conviction for engaging in a pattern of corrupt activity. Finally the trial court ordered the fifth degree (16 year) and third degree felony (3 year) sentences to run consecutively to each other and all other sentences to run concurrently for a total aggregate sentence of nineteen (19) years. Appellant was further ordered to pay restitution and the costs of the action. The fines were waived.

*Id*. at *1. Petitioner filed a timely appeal, raising the following assignments of error:

> I. THE TRIAL COURT COMMITTED HARMFUL ERROR IN SENTENCING THE DEFENDANT-APPELLANT TO A TERM OF NINETEEN (19) YEARS OF IMPRISONMENT THROUGH ENGAGING IN JUDICIAL FACT FINDING BELOW.

> II. THE TRIAL COURT COMMITTED HARMFUL ERROR IN SENTENCING THE DEFENDANT-APPELLANT TO A TERM OF NINETEEN (19) YEARS OF IMPRISONMENT DUE TO THE FAILURE OF THE TRIAL COURT TO MERGE THE SEVERAL, CONSECUTIVE COUNTS FOR PURPOSES OF SENTENCING.

> III. THE TRIAL COURT COMMITTED CONTINUING ERROR BY ALLOWING THE INTRODUCTION OF PREJUDICIAL EVIDENCE THROUGHOUT THE COURSE OF THE TRIAL.

*Id*. at *1-2. On February 21, 2008, the appellate court affirmed the judgment of the trial court. *Id*.

On August 6, 2008, the Ohio Supreme Court dismissed Petitioner's subsequent appeal. *State v. Fanaro*, 119 Ohio St.3d 1409 (2008).

Meanwhile,

> On September 17, 2007, the public defender's office filed a petition to vacate and set aside judgment and sentence pursuant to R.C. 2953.21. On September 19, 2007, the trial court scheduled the petition for "non-oral hearing" for October 17, 2007 at 8:00 A.M pursuant to Loc.R. 5. The State then filed Memoranda Contra the petition on September 28, 2007.

> On October 10, 2007, the trial court via Judgment Entry denied appellant's petition.

> On October 12, 2007, Mr. Pusateri, appellant's present counsel, entered a notice of appearance and filed a motion for continuance of the non-oral hearing. On October 15, 2007, appellant's counsel filed a motion for status conference. The State responded with Memoranda Contra appellant's motion for continuance of non-oral hearing.

> On November 9, 2007, appellant filed a notice of appeal.

> Appellant raises two Assignments of Error:

> "I. THE TRIAL COURT ERRED BY RULING ON APPELLANT'S PETITION FOR POST-CONVICTION RELIEF NINE DAYS PRIOR TO THE DATE SCHEDULED BY THE COURT FOR "NON-ORAL" HEARING, DEPRIVING HIM OF THE CHANCE TO SUBMIT ADDITIONAL MATERIALS, INCLUDING BUT NOT LIMITED TO, A MOTION FOR LEAVE TO FILE AN AMENDED PETITION.

> "II. THE TRIAL COURT ERRED BY DENYING A HEARING ON APPELLANT'S PETITION FOR POST-CONVICTION RELIEF.

*State v. Fanaro*, No. 2007CA137, 2008 WL 4694595, at *1-2 (Ohio App. 5th Dist. Oct. 24, 2008).

On October 24, 2008, the appellate court sustained Petitioner's first assignment of error and

remanded the case to the trial court. *Id.*

> On December 22, 2008, Appellant filed an amended petition for post-conviction relief in the trial court. Appellee filed a memorandum contra on January 23, 2009. Appellant filed a motion for summary judgment, or in the alternative, motion to conduct discovery on March 12, 2009. Appellee filed a memorandum contra summary

judgment on March 23, 2009. The trial court granted summary judgment in favor of Appellee and denied the petition without conducting an evidentiary hearing.

Appellant now appeals, assigning as error:

"I. THE TRIAL COURT ERRED BY FAILING TO GRANT SUMMARY JUDGMENT TO APPELLANT ON HIS CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL AND DISMISSING THE CLAIMS.

"II. THE TRIAL COURT ERRED BY FAILING TO ORDER AN EVIDENTIARY HEARING ON HIS CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL AND DISMISSING THE CLAIMS."

*State v. Fanaro*, No. 2009 CA 00066, 2009 WL 4690421, at *1-2 (Ohio App. 5th Dist. Dec. 4, 2009).

On December 4, 2009, the appellate court affirmed the judgment of the trial court. *Id.* On March 24, 2010, the Ohio Supreme Court dismissed Petitioner's subsequent appeal. *State v. Fanaro*, 124 Ohio St.3d 1522 (2010).

On July 8, 2008, Petitioner filed an application requesting the appellate court to reconsider its February 21, 2008, denial of his direct appeal in view of *State v. Cabrales*, 118 Ohio St.3d 54 (2008)(strict textual comparison of elements of offenses is not required to determine whether convictions constitute allied offenses of similar import). *Exhibit 42 to Return of Writ.* On May 11, the appellate court denied Petitioner's application for reconsideration. *Exhibit 44 to Return of Writ.* On September 30, 2009, the Ohio Supreme Court dismissed Petitioner's subsequent appeal. *Exhibit 47 to Return of Writ.*

Petitioner also filed an application to reopen his appeal pursuant to Ohio Appellate Rule 26(B), asserting that he had been denied the effective assistance of appellate counsel because his attorney failed to request a stay or to advise the state appellate of the Ohio Supreme Court's pending decision in *Cabrales.* He also asserted the denial of effective assistance of appellate counsel because

his attorney failed to raise on appeal a claim of deficient jury verdict forms. *Exhibit 36 to Return of Writ*. On May 11, 2008, the appellate court denied Petitioner's Rule 26(B) application. *Exhibit 38 to Return of Writ*. On September 30, 2009, the Ohio Supreme Court dismissed Petitioner's subsequent appeal. *Exhibit 41 to Return of Writ*.

On November 8, 2010, Petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges that he is in the custody of the Respondent in violation of the Constitution of the Untied States as follows: 1) he was denied the effective assistance of counsel because his attorney rejected the State's plea offer to a four year term of incarceration without first consulting with Petitioner regarding the evidence against him or the benefits and risks of accepting or rejecting the guilty plea offer; 2) he was denied the effective assistance of counsel because his attorney rejected the State's offer, to plead guilty to two counts in connection with each victim and restitution, without first consulting with Petitioner; 3) he was denied the effective assistance of counsel because his attorney failed to consult with Petitioner regarding the advisability of accepting or rejecting the guilty plea offer in exchange for a sentence of four years; 4) he was denied the effective assistance of appellate counsel because his attorney failed to provide notice to the Ohio Court of Appeals of the pending decision in *Cabrales*; 5) he was sentenced in violation of the Double Jeopardy Clause and; 6) he was sentenced in violation of *Blakely v. Washington*, 542 U.S. 296 (2004).

It is the position of the Respondent that Petitioner's claims are procedurally defaulted or without merit.

## PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) ( per curiam ); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a Court must undertake a four-part analysis when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id*. Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id*. Third, the Court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id*. Finally, if the Court determines that the petitioner failed to comply with an adequate and independent state procedural rule, then the petitioner must demonstrate good cause for his or her failure to follow the procedural rule as well as actual prejudice from the alleged constitutional error. *Id*. This "cause and prejudice" analysis also applies to failure

to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir.1985).

In claim two, Petitioner alleges that he was denied the effective assistance of counsel because his attorney failed to communicate with him prior to rejecting the State's plea offer. Respondent argues that Petitioner waived this claim by failing to present the issue to the Ohio courts. The record, however, indicates the contrary. Plainly, Petitioner raised this same issue in post conviction proceedings. *See Exhibit 24 to Return of Writ*, at 13. He has therefore preserved claim two for federal habeas corpus review.

In claim five, Petitioner alleges that the trial court sentenced him in violation of the Double Jeopardy Clause. Respondent argues that Petitioner waived this claim by raising it only in the context of an alleged violation of state law and by failing to raise the issue in the Ohio Supreme Court. This Court is not persuaded by the first argument. Because Ohio's statute on allied offenses , O.R.C. § 2941.25, arises from the federal Double Jeopardy Clause, *Spence v. Sheets,* 675 F.Supp.2d 792, 824-25 (S.D. Ohio 2009), a petitioner may preserve a federal Double Jeopardy claim by raising the statutory claim in the state courts. Respondent correctly notes, however, that Petitioner failed to raise this claim on appeal to the Ohio Supreme Court. *See Exhibit 15 to Return of Writ.* Instead, Petitioner raised the issue in an application for reconsideration in the state appellate court under Ohio Appellate Rule 26(A). The state appellate court rejected Rule 26(A) application as follows:

> The issue concerning merger of offenses was raised and fully considered by this Court on direct appeal based on the state of the law at that time. Appellant's claim is properly raised through his motion to re-open, alleging that counsel was ineffective for failing to alert this Court to the fact that *Cabrales* was pending before the Ohio Supreme Court.

*Exhibit 44 to Return of Writ.* Petitioner timely appealed that decision to the Ohio Supreme Cour and he argues that he thereby properly preserved the issue for review in these proceedings.

Petitioner also filed an application for reopening of his appeal under Ohio's Appellate Rule 26(B), asserting, *inter alia*, that he had been denied the effective assistance of appellate counsel because his attorney failed to advise the appellate court of, or request a stay pending, the Ohio Supreme Court's decision in *Cabrales. See Exhibit 38 to Return of Writ.* The state appellate court denied this claim on the merits.

It appears, therefore, that Petitioner's allegation in claim five that the trial court sentenced him in violation of the Double Jeopardy Clause may properly be addressed in these proceedings. Even assuming, *arguendo*, that Petitioner waived this claim, he nonetheless may offer, as cause for any procedural default, the ineffective assistance of counsel because that claim was presented to the state courta and is not itself procedurally defaulted. *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000)(ineffective assistance of counsel may constitute cause for a procedural default so long as such claim has been presented to the state courts and is not, itself, procedurally defaulted). This Court, therefore, will consider the merits of claim five in these proceedings.

## CLAIMS ONE, TWO and THREE

## INEFFECTIVE ASSISTANCE OF COUNSEL

Claims one, two and three are closely related and will be considered together here. In these claims, Petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to consult with him prior to rejecting the State's plea offer(s), improperly advised him that the State's evidence was weak, failed to discuss the ramification on sentencing of proceeding to trial,

failed to advise him of the elements of the offenses charged, and failed to review discovery materials. According to Petitioner, had defense counsel advised him that the State's case against him was strong and that he faced a potentially lengthy prison term, he would have not have proceeded to trial but would have entered a guilty plea. *See Petition*. Petitioner complains that the state courts refused to hold an evidentiary hearing on this claim and contends that the state appellate court's factual finding of overwhelming evidence of guilt supports this claim of ineffective assistance of counsel. *See Petitioner's Reply*, Doc. 15, at 2. Alternatively, Petitioner contends that other state courts' factual findings are contradicted by the record. *Id*. at 3-4. For example, Petitioner argues that overwhelming evidence of guilt is reflected by the prosecution's extensive discovery files. He contends that his counsel's time records establish that his counsel rejected the first plea offer prior to reviewing discovery and that he failed to even research the issue of restitution until after trial. *Petitioner's Reply*, Doc. 15, at 4.

The state appellate court rejected this claim, reasoning in relevant part as follows:

> Appellant maintains counsel was ineffective in rejecting plea offers without consulting petitioner, rejecting plea agreements without adequately investigating the viability of a defense to the charges, and in failing in his duty to counsel Appellant regarding the advisability of accepting or rejecting a plea offer. Specifically, Appellant asserts had counsel properly instructed him he did not have a viable defense, he would have accepted the State's first plea offer. Further, he alleges counsel summarily rejected two plea offers without consulting him.
>
> On December 22, 2008, Appellant filed his petition for post-conviction relief, attaching ten exhibits, including two letters from his trial counsel, a detailed billing statement of trial counsel, and affidavits supporting his petition.
>
> The State initially offered Appellant a four-year prison sentence, which Appellant maintains his counsel rejected without properly advising him. Second, the State demanded Appellant make restitution in exchange for a guilty plea to two counts for each victim. Appellant

asserts his trial counsel summarily rejected the offer without consultation or proper advice. Appellant's only evidence as to the allegations is his own self-serving affidavit.

In response, the State submits an affidavit of trial counsel averring he discussed the first plea offer with Appellant and advised him of the potential penalties. Counsel alleges Appellant summarily rejected the offer because he felt he did not belong in jail. The plea offer also involved restitution, which was unacceptable to Appellant due to his being financially incapable of restitution. Appellant and his wife had filed for bankruptcy in 2004, listing the victims at issue as creditors.

On January 16, 2006, trial counsel sent a letter to the prosecutor indicating the initial plea offer of four years incarceration was not acceptable, but his client could be persuaded to enter an *Alford* plea to some sort of misdemeanor. The letter was copied to Appellant; indicating Appellant had knowledge of the offer and could have discussed the matter with counsel had it been inaccurate. Appellant did not do so.

On October 3, 2006, trial counsel drafted a letter to Appellant indicating the trial was set to commence over a period of four days. In the second letter counsel explains the subsequent offer by the State involving a plea of guilty to two counts on each one of the alleged victims and restitution. Trial counsel informed Appellant he told the prosecutor it was an inferior deal to the first offer, and he was confident Appellant would not accept the offer. Accordingly, the letter contemplates Appellant's ability to inform counsel he would be willing to accept the offer. Again Appellant did not do so.

Further, Appellant's claim counsel was unprepared for trial was not substantiated by the record. Rather, the record demonstrates a set fee agreement between Appellant and counsel rendering hourly documentation beyond the set fee irrelevant. A review of the record demonstrates counsel properly cross-examined witnesses, and presented witnesses on behalf of Appellant.

Based upon the record and the evidence submitted in support and in opposition to the motion, we conclude the trial court did not err in granting summary judgment in favor of the State without an evidentiary hearing as Appellant has not set forth sufficient operative facts to establish substantive grounds for relief, let alone a reasonable probability Appellant would have accepted the plea in light of his proclaimed opposition to jail and any restitution order.

*State v. Fanaro*, 2009 WL 4690421, at *4-5.

The factual findings of the state appellate court are presumed to be correct.

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). Further, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The United States Supreme Court has explained:

> "[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.*, at 411, 120 S.Ct. 1495. Rather, that application must be "objectively unreasonable." *Id.*, at 409, 120 S.Ct. 1495. This distinction creates "a substantially higher threshold" for obtaining relief than de novo review. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," *Lindh*

> v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481
> (1997), and "demands that state-court decisions be given the benefit
> of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357,
> 154 L.Ed.2d 279 (2002) ( per curiam ).

*Renico v. Lett*, 559 U.S. –, 130 S.Ct. 1855,1862 (2010)(footnote omitted.)

> "[C]learly established" law under § 2254(d)(1) consists of "the
> holdings, as opposed to the dicta, of this Court's" cases. *Williams v.
> Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).
> An "unreasonable application" of that law involves not just an
> erroneous or incorrect decision, but an objectively unreasonable one.
> *Renico v. Lett*, 559 U.S. ----, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010).

*Wong v. Smith*, 131 S.Ct.10 (Mem), 2010 WL 752363, at *2 (Nov. 1, 2010). "A state court's

determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists

could disagree' on the correctness of the state court's decision. *Harrington v. Richter*, – U.S. –, –,

131 S.Ct. 770, 786 (2011)(quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The Court's analysis must begin with a review of the applicable law:

> Defendants have a constitutional right to effective assistance of
> counsel during plea negotiations. *Hill v. Lockhart*, 474 U.S. 52, 58-59,
> 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). The two-prong ineffective
> assistance of counsel analysis that the Supreme Court announced in
> *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d
> 674 (1984), applies to claims that counsel's performance was
> constitutionally deficient during plea negotiations. *Hill*, 474 U.S. at
> 58, 106 S.Ct. 366, 88 L.Ed.2d 203. A petitioner who claims that he
> was denied effective assistance of counsel with regard to whether or
> not to plead guilty must prove that (1) counsel rendered
> constitutionally deficient performance, and (2) there is a reasonable
> probability that but for counsel's deficient performance, the petitioner
> would have pled guilty. *Magana v. Hofbauer*, 263 F.3d 542, 547-48
> (6th Cir.2001) (citing *Turner v. Tennessee*, 858 F.2d 1201, 1206 (6th
> Cir.1988)). "A reasonable probability is a probability sufficient to
> undermine confidence in the outcome." *Strickland*, 466 U.S. at 694,
> 104 S.Ct. 2052, 80 L.Ed.2d 674.

*Humphress v. United States*, 398 F.3d 855, 859 (6th Cir. 2005). An attorney's failure to convey a plea

offer satisfies the first prong of *Strickland. Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003).

Further, a substantial disparity between the plea offer and the potential sentence exposure constitutes "strong evidence of a reasonable probability that a properly advised defendant would have accepted a guilty plea offer, despite earlier protestations of innocence." *Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003)(*citing Magana v. Hofbauer*, 263 F.3d 542, 552-53 (6th Cir. 2001)(finding the difference between a ten- and twenty-year sentence significant); *United States v. Day*, 969 F.2d 39 (3d Cir. 1992) (finding ineffective assistance of counsel when trial counsel mistakenly described the penalties at trial as ten years rather than the twenty-two years, where a plea offer of five years had been made); *United States v. Gordon*, 156 F.3d 376, 377-81 (2d Cir. 1998)(holding disparity between the ten-year sentence recommended by the plea agreement and the seventeen-and-a-half years the defendant did receive was objective evidence that a plea would have been accepted)). *See also Griffin v. United States,* 33 F.3d at 739 (evidentiary hearing warranted to determine whether defendant would have pleaded guilty where attorney failed to convey plea offer of five years and defendant sentenced to 156 months.) An attorney's failure to insist that his client accept the government's plea offer due to overwhelming evidence of guilt, however, does not constitute constitutionally ineffective assistance. *Smith v. United States*, 348 F.3d at 552.

> The decision to plead guilty - first, last, and always - rests with the defendant, not his lawyer. Although the attorney may provide an opinion on the strength of the government's case, the likelihood of a successful defense, and the wisdom of a chosen course of action, the ultimate decision of whether to go to trial must be made by the person who will bear the ultimate consequence of a conviction.

*Id*.

The United States Court of Appeals for the Sixth Circuit has described the obligations of defense counsel as it relates to advice during the plea negotiations stage:

> A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available. In a system dominated by sentencing guidelines, we do not see how sentence exposure can be fully explained without completely exploring the ranges of penalties under likely guideline scoring scenarios, given the information available to the defendant and his lawyer at the time.

*Id.*, at 553 (*citing United States v. Day,* 969 F.2d 39, 43 (3rd Cir.1992)); *see also Moss v. United States*, 323 F.3d 445, 474 (6th Cir. 2003) (Failure of defense counsel to "provide professional guidance" regarding a defendant's sentencing exposure may constitute deficient assistance). An attorney's obligation to advise his client applies equally to the defendant who maintains his innocence of the charges, because other reasons may nonetheless induce him to enter a guilty plea. *United States v. Williams*, No. 2:03-cv-2246, 2009 WL 348805 (W.D.Tenn. Feb.10, 2009)(*quoting North Carolina v. Alford,*400 U.S. at 33). The United States Court of Appeals for the Sixth Circuit has declined to require a convicted defendant to establish by objective evidence that he would have pleaded guilty had his attorney properly advised him of potential sentencing ramifications. *United States v. Williams*, 2009 WL 348805, at *5 (citing *Griffin v. United States,* 330 F.3d at 737; *Dedvukivic v. Martin*, 36 Fed.Appx. 795, 798 (6th Cir.2002(unpublished). "Thus, a court may rely on a defendant's self serving testimony that he would have accepted the plea agreement had his counsel sufficiently advised him." *United States v. Williams*, 2009 WL 348805, at *5.

Petitioner provided to the state appellate courts a sentencing chart on the potential sentence that he faced; a January 16, 2006, letter from defense counsel to the prosecution indicating that Petitioner had rejected a plea offer of four years incarceration, but that he might accept an *Alford* plea to a misdemeanor; Petitioner's affidavit; the affidavit of Petitioner's wife; a letter dated October 3,

2006, from defense counsel to Petitioner indicating that the "offer right now is they want you to plead guilty to 2 counts on each on of these 'alleged victims' and make restitution. I. . . indicated to them that I felt that wasn't even as good an offer as we had had . . and I was confident that you were not interested in doing that;" a letter dated September 25, 2006, from the State to defense counsel extending the plea offer; defense counsel's billing statement; and the affidavit of another attorney who opined, after reviewing discovery, that the prosecution had a good case and that, had he represented Petitioner, he would have "heartily" explored the possibility of a negotiated guilty plea. *See Exhibit 24 to Return of Writ, Petitioner's Exhibits to Amended Petition for Post Conviction Relief*; *see also Exhibits to Petition, Doc.* 4.

The affidavit of Petitioner's wife indicates, in relevant part, that she and Petitioner paid defense counsel a $20,000.00 retainer plus $5,000.00 for the services of an expert in securities law, which defense counsel instead applied to his fees. She contends that defense counsel repeatedly advised her prior to trial that there was "nothing to worry about." She and Petitioner were "flabbergasted and stunned" when he was sentenced to 19 years in prison. *See id.*

Petitioner's affidavit indicates that his attorney assured him that, although the case was large, the State did not "have anything on" him. Petitioner' affidavit further indicates:

> On January 13, 2006, I received a call from Mr. Tyack [defense counsel] informing me that the prosecutor had made a plea offer of four years, but that he had rejected it. He told me that his reasons for doing so were that this was the State's "first offer," and that they did "not have a case." As I had retained Mr. Tyack on the highest recommendation, I questioned this not at all.
>
> A short time thereafter, I received from Mr. Tyack a copy of a letter he had sent to the prosecuting attorney. It confirmed Mr. Tyack's rejection of the four-year plea offer, and offered to plead to "some sort of misdemeanor" for time served – 75 days – while I [was] awaiting extradition from Florida. The offhand manner of his rejection gave

me confidence, as I considered it an expression to his opponent of what he had told me about our strong position. . . .

Through the period between my original indictment in October, 2005, until my trial in December 2006, I spent a total of approximately two hours speaking with Mr. Tyack about the substance of my case. Most of this was on October 13, 2006, when I flew in to meet him at the Concourse Hotel at Port Columbus International Airport. . . .

\*\*\*

Not. . . in any telephone conversation, nor in the twenty minutes I spent with Mr. Tyack loading file boxes into his vehicle on the weekend before trial. . . did he do anything to prepare me for testifying in my trial.

Not long before trial, I received a letter from Mr. Tyack [indicating] he had received and rejected another offer for a plea bargain. It would have involved guilty pleas to two counts for each victim, restitution, and a sentence left entirely to the judge. . . . I assumed Mr. Tyack knew the ins and outs of my case, both fact and law, and that his rejection of the offer was in my best interests. To put it more bluntly, if he was confident, then so was I.

I was never advised that a four year sentence imposed pursuant to the first plea offer would leave me for Judicial Release after serving 180 days; nor that if I were sentenced to five years I would be eligible for Judicial Release in four; nor that if I were sentenced to between five and ten years I would be eligible for Judicial Release in five; nor that if I were sentenced to a term in excess of ten years that I would not be eligible for Judicial Release at all. The term "Judicial Release" never came up.

I was never advised that the down-side risk of trial was consecutive sentencing that could add up to many, many years, nor that the total potential exposure I had was in excess of 200 years.

Continuing through my trial. . . . he never changed his tune that the State did not have a case. He did not prepare me at all for my testimony. When I was forced to admit lies on the witness stand, I knew things looked bad, but still Mr. Tyack said not to worry. He told me we did not need Mr. Hurd or any other expert witnesses.

. . . . I was under the continuous impression that Mr. Tyack was

learning the necessary securities law and the facts of the case to properly defend me, and also to respond to, and properly advise me about, potential plea bargain possibilities.

***

Had I been properly informed about the strength of the State's case, and the possible sentences involved, I would have instructed my attorney to accept the four-year offer if he could not improve upon it. I was 64 years old, and had I been aware of even the remote possibility I could receive a sentence of 19 years, I would not have taken the chance of going to trial.

***

. . . [H]ad I been properly advised regarding my case, and had my attorney not been able to improve on that offer, I would have accepted it.

*Affidavit of Carl G. Fanaro* (footnote omitted).

The affidavit of defense counsel indicates in relevant part

In the summer of 2005, after Mr. Fanaro had been arrested in Florida on a multi-count indictment issued by the Licking County Grand Jury, I was contacted by an attorney by the name of Sam Leonard from Florida who was a friend of Mr. Fanaro with regard to possibly representing Mr. Fanaro. We met and I agreed to undertake the representation. My initial contact with Mr. Fanaro here in Ohio was a lengthy conference. This was a conference on August 2, 2005, while he was incarcerated in the Licking county Jail. I undertook the necessary steps to have the bond situation revisited and on August 31, 2005, a $10,000 cash bond was posted to obtain Mr. Fanaro's release from the Licking County Jail.

The indictment in question accused Mr. Fanaro of operating essentially in conjunction with a gentleman whose last name was Mayes, engaging in a pattern of sale of unregistered securities, sale of securities without a license, making false representations with regard to securities and securities fraud. The allegations evolved from the sale of partnership interests in limited partnerships which Mr. Mayes had created with the assistance of counsel in Florida relating to ownership interests in cable companies with the business entities being created in Florida.

The usual discovery demands, etc., were made and voluminous documents were provided, however, many of them were of no real relevance to the core issues in the case. For example, it was undisputed that Mr. Fanaro had facilitated the purchase by a number of people of the limited partnership interests, although he had no ownership interest in the partnerships and, in fact, received no commission from those entities controlled by Mr. Mayes for obtaining individuals who were interested in making these investments. These investments were usually part and parcel of a package where Mr. Fanaro also facilitated the acquisition of annuities with appropriate insurance companies for the same individuals and the reality is that as the discovery materials demonstrated the limited partnerships became relatively valueless. The discovery materials demonstrated, in fact, there had been no payments to Mr. Fanaro from those limited partnerships. The fact that the individuals had p[aid money into them was not disputed. They had paid money to acquire the insurance annuities as well. The tax returns, etc., of the limited partnership, all of which were reviewed, demonstrated the income and loss of those partnerships and confirmed the fact that Mr. Fanaro had received no distribution therefrom.

In addition, the documents relating to the acquisition of the limited partnership interests included the prospectus, which included a letter prepared by counsel out of Florida, indicating these were speculative investments and that no guarantees could be made with regard to their ultimate value. During the trial it became interesting to note that, in fact, many individuals denied ever having seen the prospectus, although Carl was adamant that. . . they had been provided the documentation prior to investing and there was some corroboration of the fact . . . because the application forms that were utilized by these people to invest in the LLCs were actually a part of the bound prospectus package, which meant in order to have the document to fill it out they had to have received the prospectus, containing the warning that these were speculative investments, they denied remembering receiving.

The suggestion that. . . discovery was not reviewed. . . is simply incorrect. Discovery was reviewed and the critical issues with regard to lack of payment to Mr. Fanaro of commissions, payment to the LLCs, the prospectuses, and the letter from the attorney in Florida were all reviewed thoroughly and corroborated Carl Fanaro's version as to what the situation was. Much of the material provided had no relevance to the disputed issues.

The Licking County Prosecuting Attorney's Office made a settlement offer which included restitution and a jail sentence of four years. This was conveyed to Mr. Fanaro and he summarily rejected it indicating that he did not feel he belonged in jail. And in addition he was financially in the position where he had no possible way of making restitution. (The reality is that he and his wife had filed bankruptcy in 2004. . . and listed most of the alleged victims of this indictment as creditors and received a Chapter 7 discharge. Mr. Fanaro and his wife made it clear that they did not want this information discussed or revealed with the Prosecuting Attorney or with the Attorney General's Office's representative. . . . )

The maximum penalty levels on both the initial indictment and the superseding indictment were discussed with Mr. Fanaro. However, I also advised him that, based on the status of the law at that time. . . given his lack of prior felony record. . . there was a strong argument that could be made that consecutive or maximum sentences would be inappropriate.

At Mr. Fanaro's request I discussed the situation with regard to the securities registration issue and sale of unregistered securities with attorney Dwight Hurd who had represented both Mr. Mayes and Mr. Fanaro in previous matters. Mr. Hurd felt that. . . an argument could be made that these were exempt given the situation in terms of being LLCs involving cable companies out of Florida, and given the letters in the prospectus demonstrating that they were, in fact, a speculative type of investment. However, given the fact that he had represented Mr. Fanaro on matters before the Insurance Department of the State of Ohio and had represented both Mr. Mayes and Mr. Fanaro on matters relating to other business transaction and entities he was reluctant to agree to testify and confirmed that. . . proper cross examination could create issues which might not be in Mr. Fanaro's favor.

Shortly before trial the Attorney General's Office tendered another offer of a plea which involved two counts as to each alleged victim leaving the sentencing to the judge but with a provision that restitution be made and it was clear that the restitution was to be undertaken prior to or concomitant with any plea. Given Mr. Fanaro's financial condition and the bankruptcy. . . that offer was rejected as well because it was absolutely impossible for Mr. Fanaro to provide that quantity of funds being asked for and, more significantly, probably would have raised an additional issue as to whether or not it would expose Mr. Fanaro to renewed civil liability given the status of the

Chapter 7 bankruptcy where the alleged victims had not challenged the dischargeability as to the debt.

During the same period of time in 2006, Mr. Fanaro was actually sued in Delaware County by one of the alleged victims in this case. We were representing him on that case as well and in that case we pled in the Answer the affirmative defense of the bankruptcy. Thus, while that information was a public record in that civil case, I had no information to suggest that the Attorney General's Office was aware of that civil case, I had no information to suggest that the Attorney General's Office was aware of that civil case or aware of the pleading.

The suggestion that. . . no time was spent preparing Mr. Fanaro to testify is simply untrue. Consistent with my usual practice, I reviewed in general terms what the areas that would be covered prior to trial and instructed Mr. Fanaro to listen carefully what was going on at the trial and we would, in fact, go over the materials and what he had heard prior to his testimony so that we could meet the allegations head on. Mr. Fanaro had received the appropriate documentation, discovery and exhibits, etc., in Florida, and responded to them in summary fashion.

Attached hereto as an exhibit is the outline of Mr. Fanaro's proposed testimony and the areas that were to be covered. In addition, Mr. Fanaro had faxed to me on the weekend before his testimony his summaries as to each victim, what he remembered about them. . . over and above the documentation we had provided. The material was then reviewed with him prior to him getting on the witness stand and any suggestion that he "had to lie" is absolutely untrue. He was encouraged, as always, that he needed to tell the truth but if he did not understand a question asked on cross examination it was his responsibility to indicate that he did not understand it and ask for clarification.

The allegation that only two hours were spent discussing the substance of the case is simply untrue.

There were many hours where we reviewed matters with Mr. Fanaro but, again it must be recalled that certain aspects of the facts of the case were not in dispute; that the entities had been sold; that he had sold them; that he collected no money directly from any of the LLCs and that it was a part of an estate planning procedure that he undertook to also sell these people insurance annuities which actually had increased substantially in value so that a number of these individuals'

24

actual total value of the investments that Mr. Fanaro had placed them in exceeded that which, even with the loss on the cable company, of that which they had invested.

Because of Mr. Fanaro's limited financial situation we had adjusted what had initially been undertaken as a fee arrangement. We agreed that there would be a flat fee of $20,000 up to trial and $5,000 would be maintained in the Trust account for any extraordinary expenses and that money could be applied as well to the fee, depending on the amount of trial time and that after trial we would revisit the issue of additional compensation. As a result of the flat fee arrangement it was not necessary for me to keep precise time records as to the pre-trial work done on the case and, candidly, the amount of time devoted was substantially more than what was written down simply because of the flat fee arrangement. Comprehensive time record was maintained during the trial procedure and as the attached ledger demonstrates in excess of $41,000 in time was spent on this case. Mr. Fanaro's $20,000 was applied to the fee and the remainder of the amount from the $5,000 being held in the Trust account was applied to the fee.

*Affidavit of Thomas M. Tyack.*

Petitioner has also attached, in support of this claim, the affidavit of Edward Mayrides, a paralegal who worked for Dennis Pusateri (*Petitioner's Exhibit F*); an index to items provided in discovery; a letter from Attorney Dwight Hurd indicating that he had agreed to provide advice to Attorney Tyack regarding securities issues in exchange for a retainer of $5000.00, but that defense counsel did not pursue that course of action, *Petitioner's Exhibit Z*; and newspaper articles regarding the case. *See Petitioner's Exhibits,* Doc. 4. Because Petitioner did not, apparently, submit these documents to the state courts, *see Exhibit 24 to Return of Writ*, nor can he establish that he acted diligently in attempting to do so, this Court cannot not now consider these documents in support of his claim in these proceedings. *See* 28 U.S.C. 2254(e)(2); *Cullen v. Pinholster*, – U.S. –, 131 S.Ct. 1388, 1398 (2011); *Holland v. Jackson*, 542 U.S. 649, 652 (2004); *Sheppard v. Bagley*, 657 F.3d 338, 2011 WL 4031097, at *3 (6th Cir. Sept. 13, 2011)(refusing to consider evidence not considered

by state courts in view of *Pinholster*).

As to Petitioner's assertion that his attorney failed to consult with him prior to rejecting the prosecution's plea offer and failed to review discovery or to conduct adequate investigation prior to trial, this Court is not persuaded that the record demonstrates a basis for relief. As noted by the state appellate court, the record demonstrates that defense counsel notified Petitioner on at least two occasions in writing of the plea offer extended by the prosecution. Nothing in the record even suggests that Petitioner was prevented from accepting the plea offer or was unable to direct his attorney to do so on his behalf, regardless of his having earlier rejected the offer. Petitioner's allegation that defense counsel failed to review discovery or was unprepared for trial likewise is not supported by the record. Petitioner has referred to nothing in the trial transcript indicating that his attorney performed in a constitutionally unreasonable manner, either at trial or at sentencing . The state appellate court explicitly concluded that etitioner's allegations in this regard were not substantiated by the trial transcript, and Petitioner has failed to rebut the presumption of correctness attached to that factual finding. Additionally, and despite Petitioner's argument to the contrary, this Court is unable to conclude that the state appellate court unreasonably concluded that defense counsel's billing statement failed to support Petitioner's claim, since defense counsel's affidavit indicates that he did not keep precise records of time prior to trial in view of the flat fee arrangement agreed to by Petitioner and his counsel. Thus, Petitioner's argument that his attorney failed to prepare for trial or to review discovery in a timely manner is mere conjecture. Petitioner has also failed to establish the ineffective assistance of counsel under *Strickland* based on his attorney's failure to consult with him prior to rejecting the State's guilty plea offer. The Magistrate Judge **RECOMMENDS**, therefore, that these claims of ineffective assistance of counsel be **DISMISSED**.

That said, the crux of Petitioner's claim is that his attorney failed to advise him of the strength of the government's case against him and of the potential sentence that he faced should he be convicted at trial. In this regard, Petitioner alleges that his attorney failed to explain how the State would prove the elements of the offenses charged and failed to review the evidence against him prior to trial. Assuming Petitioner's allegations to be true, he has set forth a substantive ground for relief. *See Hill v. Lockhart*, 474 U.S. at 58-59. Defense counsel, on the other hand, denies these allegations and alleges that Petitioner proceeded to trial because he refused to agree to jail time and could not afford to pay restitution.

The state court rejected this claim without conducting an evidentiary hearing, reasoning that the only evidence in support of his claim was his own self-serving affidavit. Proper resolution of the issue, however, necessarily requires a credibility determination between these competing factual assertions. Because the state courts did not engage in such a credibility determination, this Court concludes that an evidentiary hearing must be held by this Court on Petitioner's claim that he was denied the effective assistance of counsel because his attorney failed to advise him of the advisability of proceeding to trial and of the potential sentencing ramifications that he faced.

As the remainder of Petitioner's claims may become moot, depending on the outcome of these proceedings, the Court will defer consideration of those claims at this juncture.

**WHEREUPON**, the Magistrate Judge **RECOMMENDS** that an evidentiary hearing be held on Petitioner's claim that he was denied the effective assistance of counsel because his attorney failed to advise him of the advisability of proceeding to trial and of the potential sentencing ramifications that he faced. The Magistrate Judge **RECOMMENDS** that the remainder of Petitioner's claims of

ineffective assistance of trial counsel be **DISMISSED** as without merit. Because resolution of habeas corpus claims four through six may turn on the outcome of evidentiary hearing, the Court will defer consideration of those claims at this juncture.

## PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation,* that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

  *s Norah McCann King*  
Norah McCann King  
United States Magistrate Judge

February 3, 2012